Filed 1/28/14  P. v. Garcia CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARMANDO DEJESUS GARCIA,<br><br>    Defendant and Appellant. | B245907<br><br>(Los Angeles County<br>Super. Ct. No. GA080315) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stanley Blumenfeld, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez, Deputy Attorney General, for Plaintiff and Respondent.

Appellant Armando DeJesus Garcia was convicted of attempted murder, kidnapping to commit rape, forcible rape and assault with a deadly weapon. The jury found true the allegations that appellant used a deadly weapon in the commission of the kidnapping and inflicted great bodily injury in the commission of the kidnapping and assault. The jury also found true the allegation that the movement of the victim during the kidnapping substantially increased the risk of harm. The trial court sentenced appellant to a total term of 25 years to life in state prison.

Appellant appeals from the judgment of conviction, contending the trial court's admission of the victim's preliminary hearing testimony violated his constitutional right to confrontation and the court's denial of his motion to dismiss the attempted murder charge violated his constitutional right to due process.

FACTS

On the morning of June 11, 2010, James Word was driving on Lopez Canyon Road. The road is a two lane road with little traffic which goes through mountains and brush. There is an area at the bottom of the road where people can get dirt and mulch, and a cemetery farther along the road. Word was on his way to the cemetery. As he drove up the hill to the cemetery, he saw what looked like the naked body of a woman covered in blood. She was lying face down on a pile of dirt about 16 feet from Word's truck. He called out to her, but received no response.

Word drove back down the hill to get cell phone service and called 911. He then went back up the hill. When he reached the area where the bloody woman was lying, he saw a National Forest worker and a woman on a golf cart trying to help the bloody woman, who was now covered with a blanket. The forest worker asked the woman for a phone number, and she replied, "Armando Garcia."

Paramedics arrived about ten minutes after Word called them. Paramedic supervisor Joe Anastasia found the bloody woman alert and oriented, but visibly upset.

2

She identified herself as A.C., and said, "Armando Garcia did this to me." Garcia is A.C.'s brother-in-law. He has been married to A.C.'s sister E. for 30 years.

Paramedics examined A.C. and observed traumatic injuries to the back of her head. She had deep wounds with multiple deep lacerations. Because of these injuries, the paramedics tried to get A.C. to the hospital very quickly.

At the hospital, A.C. required emergency intubation and an operation to repair her scalp lacerations. She was in the intensive care unit for her first day and spent a total of five days in the hospital.

Sandra Wilkinson, a sexual assault nurse examiner, examined A.C. in the intensive care unit on June 11. Wilkinson swabbed A.C.'s neck, ear, breasts, vagina and anus. The swabs were sent to a laboratory for DNA comparison. Appellant's sperm was found on the swabs from A.C.'s genital area and anus.

Los Angeles County Sheriff's Deputies also came to the scene. Deputy Gamez arrived after the paramedics had taken A.C. to the hospital. The deputy found the base of a shovel and its handle about 25 feet from the road. He also found a water bottle, a machete and an inflatable mattress. There was blood in the center of the mattress. There was blood on the machete, and A.C. was the major contributor.

Law enforcement personnel examined appellant's Dodge Dakota truck. There were bloodstains on the interior of the truck cab, on the ceiling, passenger door, driver's door and steering wheel. The blood on the truck's ceiling and passenger door matched A.C.'s blood. The blood on the driver's door matched appellant.

On June 12, A.C.'s son G.C. visited her in the hospital and learned what had happened to her. He then went to appellant's house and asked appellant, "Why?" Appellant "bowed his head and said 'I'm sorry for what I did. I am regretful, I repent." G.C. again asked, "Why?" Appellant stated, "I felt like killing myself for what I did. If your mother would have died, I would have killed myself." Appellant claimed he had gone back to the scene of the incident. G.C. called 911 and appellant was arrested.

A.C. did not appear for trial, and her preliminary hearing testimony was read to the jury. On June 11, 2010, at about 7:30 a.m., A.C. was waiting for a bus at the corner

3

of Woodman and Vanowen.  She was on her way to her work cleaning a house in Northridge.  Appellant pulled up and asked her if she wanted a ride to work.  A.C. accepted and got into his truck.

At some point, appellant pulled over and asked A.C. to look on the floorboard for a card he needed.  She leaned forward to look, and appellant hit her in the back of the head.  He then hit her five to seven times while he drove.  Every time A.C. moved, appellant hit her in the head.  She was dizzy and felt blood dripping down the back of her head.  She decided to play dead.

Appellant stopped the truck at Lopez Canyon.  A.C. continued to play dead.  Appellant pulled her out of the truck, laid her on plastic and took off her clothing.  He then inserted his penis into her vagina and ejaculated.  A.C. continued to play dead.  She heard appellant drive away, but she was going in and out of consciousness.  When she came to, she saw "wilderness."  She heard a car going by and went to get help.  She saw a shovel and a machete by the area she crawled out of.

A.C. spoke with Los Angeles County Sheriff's Department Detective Alma Aguirre twice while she was in the hospital.  A.C. did not know why appellant attacked her, but thought it was because she told her sister E. that appellant was having an affair.  E. was still married to appellant.

4

DISCUSSION

1. Use of preliminary hearing testimony

Appellant contends the trial court erred in finding the prosecution used due diligence to locate A.C. for trial, and further erred in finding appellant's counsel had an adequate opportunity to cross-examine A.C. at the preliminary hearing. He concludes the use of A.C.'s preliminary hearing testimony at trial violated his federal constitutional right to confrontation.

a. Proceedings below

Before trial, A.C. was cooperative. She kept in touch with Detective Aguirre, accepted service of a subpoena, and arranged for her son G.C. to take her to court.

A.C. was due to appear in court on this matter on August 27, but on the morning of August 27, G.C. discovered that she was not home. A.C. returned home in the afternoon of August 27, told her son that she did not want to testify, and left for a "job where she would be in-house for three days." A.C. told her son that she would return on August 29. She did not.

The People sought to use A.C.'s preliminary hearing testimony. On August 31, the trial court held a hearing to determine whether that testimony could be used. G.C. testified about his efforts to find A.C. He called her cell phone and spoke with her repeatedly, but could not learn her whereabouts or convince her to appear for trial. The court expressed concern that this evidence alone could not show due diligence, but gave the People the opportunity to present more evidence.

On September 4, Detective Aguirre testified about efforts to find A.C. Once Detective Aguirre learned A.C. was missing, she called A.C.'s phone, but A.C. did not answer. The detective left a message, but A.C. did not return it. Detective Aguirre drove to A.C.'s last known address, which was also G.C.'s residence. She spoke with G.C.

5

Detective Aguirre then drove to E.'s house. E. said A.C. was not there and she did not know where A.C. was. The detective called A.C.'s niece Kathy. Kathy said that she had recently spoken with her mother Gloria and that Gloria did not mention anything about A.C. staying at Gloria's house in Lancaster. On September 5, the trial court again found insufficient evidence of due diligence. The court gave the People one more day to try to find her.

At the trial court's suggestion, Detective Aguirre drove to Gloria's house in Lancaster. There, the detective spoke with Gloria's husband and son. Both said they had not seen A.C. in more than a week. The family allowed Detective Aguirre to enter the house and look for A.C. She was not there. Detective Aguirre then went back to A.C.'s house. She spoke with two women who lived on the property. One said she last saw A.C. on August 27; the other could not remember when she last saw A.C. Detective Aguirre was able to check A.C.'s house, including two locked rooms, and verify that A.C. was not there. Detective Aguirre left, but returned later and spoke with two other people who lived on the property. Both said they had not seen A.C. in over a week.

Detective Aguirre asked the Lancaster Sheriff's station to check Gloria's house again in the evening to make sure A.C. was not there. A sheriff's deputy went to the house, and reported A.C. was not there. Detective Aguirre also asked the District Attorney Investigator to send a unit to E.'s house to make sure A.C. was not there. That unit had not reported back at the time of the hearing in this matter.

Detective Aguirre did not make telephone calls to either of G.C.'s two brothers. One of the brothers, who had previously lived with A.C. and G.C., had moved out of state. It was not clear whether the other brother was related to A.C.

On September 6, the trial court found that the People had exercised reasonable diligence in trying to locate A.C., and found A.C. to be an unavailable witness. On September 7, the court issued a written order on its ruling. The court found the prosecution's search for A.C. was timely in light of her cooperation with the prosecution up until August 27. The court also found the prosecution's initial decision to work with G.C. to be reasonable, because "[w]hile it was clear on August 27th that [A.C.] did not

6

want to testify, the strength of her conviction had not yet become plain. The prosecution reasonably concluded that [G.C.] offered the best opportunity to convince his mother to comply with the subpoena." The court found it became clear on August 29th that A.C. intended to defy the subpoena. The prosecution then had an obligation to act and the prosecution did "ratchet up its efforts to locate [A.C.]."

The court reviewed the prosecution's efforts "in their totality based on the facts confronting the prosecution. The most salient facts are that A.C. is deliberately hiding and G.C. is intently assisting the prosecution to procure her attendance. The most likely known place where A.C. might be hiding is at one of her sister's houses. The court is satisfied that the prosecution has been diligent in identifying those two places as the most likely known places and in investigating whether A.C. is staying at one or both places. " The court was also satisfied that the prosecution "reasonably relied on G.C. to try to find A.C. Based on G.C.'s motivation and history of cooperation, it is reasonable to believe that [G.C.] would have directed the detective to his brother if he believed his brother had information about his mother's whereabouts."

b. Applicable law

The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) "'An exception to this right exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial.' [Citations.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 674-675.)

In California, "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the

declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code § 1291, subd. (a).) A witness is unavailable if "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code,§ 240, subd. (a)(5).)

The California Supreme Court often describes the efforts required by section 240 as involving "due diligence." (See *People v. Fuiava, supra*, 53 Cal.4th at p. 675.) "[T]he term 'due diligence' is incapable of a mechanical definition, but it connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. Relevant considerations include whether the search was timely begun, the importance of the witness's testimony, and whether leads were competently explored." (*People v. Fuiava, supra*, 53 Cal.4th at p. 675 [internal quotation marks and citations omitted].)

"It is enough that the People used reasonable efforts to locate the witness.' [Citation.]" (*People v. Fuiava, supra*, 53 Cal.4th at p. 677.) "[T]he Sixth Amendment does not require the prosecution to exhaust every line of inquiry, no matter how unpromising." (*Id*. at p. 677.)

When the facts are undisputed, a reviewing court decides the question of due diligence independently, not deferentially. (*People v. Fuiava, supra,* 53 Cal.4th at p. 675.)


        c.  Analysis


Appellant contends the prosecutor did not exercise due diligence because she did not have law enforcement personnel attempt to contact G.C.'s brothers. We do not agree.

G.C. testified that A.C.'s two closest relatives in the area were her sisters E. and Gloria. Investigators pursued those two leads, but did not find A.C. and did not obtain any information on A.C.'s whereabouts. Investigators also spoke with people living in A.C.'s house and an adjacent house and did not obtain any information on A.C.'s whereabouts. These were the most promising lines of inquiry, and the prosecutor pursued them.

G.C. wanted to see appellant brought to trial, but did not suggest to investigators that A.C. might be staying with one of his brothers, or might have confided in one of them. Thus, it is unlikely that A.C. had a close relationship with G.C.'s brothers. One of the brothers, Marvin, did not live in California at the time of trial, reducing the likelihood that he would know of A.C.'s whereabouts. It was not established that the other brother was biologically related to A.C., further reducing that likelihood that he would know of her whereabouts. G.C.'s conversations with A.C. showed that A.C. was deliberately concealing her whereabouts. Thus, even if A.C. had turned to one of G.C.'s brothers, it is highly unlikely she would have done so unless she was confident that he would conceal her whereabouts. The brothers were thus an unpromising line of inquiry, and the prosecutor was not required to pursue it.

The prosecutor pursued the most promising lines of inquiry competently. Her overall efforts were reasonable.


d. Appellant had an opportunity to cross-examine A.C. at the preliminary hearing


Appellant contends that his counsel did not cross-examine A.C. at the preliminary hearing with the same motive and opportunity as he would have at trial, and so the admission of that testimony violated his stated and federal constitutional right to confrontation. We do not agree.

Admission of the former testimony of an unavailable witness is permitted under Evidence Code section 1291 and does not offend the confrontation clauses of the federal or California constitutions if the defendant had the right and opportunity to cross-examine the witness with an interest and motive similar to that at trial. (*People v. Williams* (2008) 43 Cal.4th 584, 626-627.) "As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity. [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 975)

Appellant does not identify what his counsel's differing motives and opportunities were; he says they are "self-evident." They are not. A.C.'s preliminary hearing testimony established appellant's guilt. Appellant certainly sought to discredit her account of events at that hearing. Logic dictates that his interest and motive in cross-examining A.C. at trial would be the same: to discredit her testimony that he kidnapped, assaulted, raped, and attempted to murder her. (See *People v. Zapien, supra,* 4 Cal.4th at p. 975 [preliminary hearing testimony of witness tended to establish defendant's guilt; defendant interest in discrediting that testimony was identical at that hearing and at trial].)

To the extent that appellant contends that *People v. Zapien, supra,* is no longer good law after the U.S. Supreme Court's decision in *Crawford v. Washington* (2004) 541 U.S. 36, appellant is mistaken. *Crawford* did not involve the admission of preliminary hearing testimony. The Court in *Crawford* did recognize that preliminary hearing testimony is "testimonial" and so is admissible at trial only if the witness is unavailable and "the defendant had an adequate opportunity to cross-examine" the witness. (*Id.* at pp. 57, 68.) There is no discussion in *Crawford* of what constitutes "an adequate opportunity to cross-examine." Thus, nothing in *Crawford* calls the reasoning or holding of *Zapien* into question.

### e. Harmless error

Even if constitutional error occurred, it would be harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The harmless error inquiry asks: "Is it clear beyond a reasonable doubt that a rational [trier of fact] would have found the defendant guilty absent the error?" (*Neder v. United States* (1999) 527 U.S. 1, 18.) The answer in this case is yes.

A.C.'s statement to bystanders, paramedics and police, coupled with the blood and semen evidence shows appellant's guilt of kidnapping, rape, assault and attempted murder beyond a reasonable doubt. A.C. was found alone and severely injured in a remote location. A shovel was found near her. A.C.'s injuries were observed by

10

bystanders and paramedics. The injuries required surgery and a day in the intensive care unit of a hospital. A.C.'s blood was found in several areas inside appellant's truck and was also on the handle of a machete found nearby. Appellant's semen was on A.C.'s genitals and anus. One of the paramedics testified that A.C. told him: "Armando Garcia did this to me." Detective Aguirre testified that A.C. stated that appellant raped her. Further, appellant acknowledged involvement in the crimes to A.C.'s son G.C., stating that he was sorry, that he went back to check on A.C. and that he would have killed himself if A.C. had died.

Appellant suggests that the error is not harmless because it is possible that "the sexual activities on Lopez Canyon Road began on a consensual basis and that a fight subsequently took place but appellant did not kidnap her, did not attempt to kill her; and did not rape her." Appellant's theory is not consistent with the evidence summarized above, and he points to no other evidence to support his theory.

2. Penal Code section 995

Appellant contends the trial court erred in denying his Penal Code section 995 motion to dismiss the attempted murder charge.

a. Proceedings below

At the preliminary hearing, the magistrate stated: "I simply don't see the evidence that would support count 1 with respect to the issue of taking a direct step which was intended to cause the death of [A.C.]" The magistrate elaborated: "That is not that it can't plausibly be [attempted murder]; but the court's view of the evidence is that the blows were inflicted for purposes of raping her, which is what his intent was at the outset. And if there was any other evidence to suggest, for example, that someone was in the vicinity at the time that he fled, thereby thwarting an effort to kill her, the court would hold him to answer for count 1, because then the court would look at the machete, would

11

look at the shovel in particular, and conclude that would be sufficient evidence to support count 1. [¶] . . . . "I'm not making any factual findings against the People in this regard. It's simply this court's interpretation of the evidence."

Following the preliminary hearing, the People filed an information which charged appellant with attempted murder. Appellant's counsel filed a motion to dismiss the charge pursuant to Penal Code section 995. The trial court denied the motion, stating: "[H]ad Judge Blumenfeld made a finding of fact, I would not be able to take issue with it. But when I looked at the transcript and I saw that she was brought into the hospital in critical condition, hit five to seven times in the car most likely with a machete, that that indicated to me an intent that was more consistent with an intent to kill than an intent to simply rape and to render her helpless. [¶] So I'm not re-weighing the evidence, but I'm drawing different inferences from the evidence."

### b. Applicable law

"In determining if charges in an information can withstand a motion under section 995, neither the superior court nor the appellate court may reweigh the evidence or determine the credibility of the witnesses. [Citations.] Ordinarily, if there is some evidence in support of the information, the reviewing court will not inquire into its sufficiency. [Citations.] Thus, an indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged. [Citations.]" (*People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226.) The evidence in support of the information may consist of "'circumstantial evidence supportive of reasonable inferences on the part of the magistrate.' [Citation.] 'Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information.' [Citations.]" (*Ibid*.) "We review the evidence in support of the information to determine whether as a matter of law it is sufficient, not whether the trial court's ruling was reasonable. [Citations.]" (*People v. Superior Court (Jurado), supra,* 4 Cal.App.4th at p. 1226.)

To prevail on appeal from a denial of a Penal Code section 995 motion, an appellant must show not only that the denial of his motion was erroneous, but that he was prejudiced by such error. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 140.)

c. Analysis

The magistrate's ruling on the attempted murder charge was based on the inferences the magistrate drew from the evidence concerning appellant's intent in striking A.C. The magistrate expressly stated he was not making any factual findings against the People.[1] The trial court correctly determined that it was not bound by the magistrate's inferences.

There was more than enough evidence at the preliminary hearing to bind appellant over for trial on the charge of attempted murder. Appellant hit A.C. in the back of the head five to seven times, drove her to a remote location, stripped her naked, raped and left her, bloody and naked, in the bushes. A bloody machete and a shovel were found near A.C. A.C. was in critical condition when she was taken to the hospital, required surgery and was placed in the intensive care unit for several days. This evidence supports a reasonable inference of an intent to kill. The trial court did not err in denying appellant's motion to dismiss the attempted murder charge.

Further, even if the trial court had erred, appellant has failed to show prejudice. (See *People v. Letner and Tobin, supra,* 50 Cal.4th at pp. 139-140 [defendant must show prejudice].) Generally, a defendant cannot show prejudice if he or she is subsequently convicted on the charge in question by sufficient evidence. (*Id.* at p. 140.) That was the case here. The jury convicted appellant of attempted murder.

---

[1] If a magistrate does not make factual findings, the court "cannot assume that he has resolved factual disputes or passed upon the credibility of witnesses." (*People v. Slaughter* (1984) 35 Cal.3d 629, 638.) "A mere refusal to hold to answer does not amount to a factual determination fatal to the charge." (*People v. Superior Court* (*Day*) (1985) 174 Cal.App.3d 1008, 1017.)

Appellant contends that he was prejudiced because the jury found not true the allegations that (1) the attempted murder was willful, deliberate and premeditated; (2) appellant personally used a deadly and dangerous weapon in the commission of the attempted murder and (3) appellant inflicted great bodily injury in the commission of the attempted murder. Appellant does not explain how these findings demonstrate prejudice.

Prejudice can be established by, inter alia, showing that the jury heard evidence that it would not have heard if the count had been dismissed before trial. (*People v. Arjon* (2004) 119 Cal.App.4th 185, 192.) Appellant has made no such showing. Infliction of great bodily injury was alleged on the kidnapping, rape and assault charges, while use of a deadly weapon was alleged as to the kidnapping and rape charges. Evidence relevant to those allegations would have been admitted at trial even if the attempted murder charge had been dismissed. Appellant has not identified, and we do not see, any evidence which was admitted solely to prove that the attempted murder was willful, deliberate and premeditated, and which could not have been admitted if that charge had been dismissed.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


O'NEILL, J.[*]


We concur:



TURNER, P. J.



KRIEGLER, J.

---

[*] Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.